Joseph Edmund PUERTAS, Petitioner,

v.

William OVERTON, Director, Michigan Department of Corrections, Nick Ludwick, Warden, Egeler Reception and Guidance Center, and Michael Bouchard, Sheriff, Oakland County, Respondents.

No. CIV.03–40157.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 19, 2004.

Elizabeth L. Jacobs, Detroit, MI, Robyn B. Frankel, Bloomfield Hills, MI, for Petitioner.

John S. Pallas, Oakland County Prosecutor's Office, William G. Pierson, Oakland County Corporation Counsel, Pontiac, MI, for Respondents.

## MEMORANDUM OPINION AND OR-DER DENYING PETITION FOR THE WRIT OF HABEAS CORPUS

GADOLA, District Judge.

Before the Court is a petition by Joseph Edmund Puertas for the writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, the Court will deny the petition.

## I. BACKGROUND

Petitioner was tried in Oakland County Circuit Court with co-defendant James Michael Talley. On November 1, 1999, the jury convicted Petitioner of (1) conspiracy to deliver 50 to 225 grams of a controlled substance, second offense under Michigan Compiled Laws § 333.7413(1)(c), (2) operating a criminal enterprise under Michigan Compiled Laws § 750.159i(1), and (3) six counts of delivery of less than 50 grams of cocaine, second offense under Michigan Compiled Laws § 333.7413(2). Co-defendant Talley was convicted of operating a criminal enterprise and three counts of delivery of less than 50 grams of cocaine. Talley was sentenced to lifetime probation. The Michigan Court of Appeals summarized the events leading to these convictions:

> On August 7, 1997, the Oakland County Sheriff's Department raided the home of Jimmy Sweeney, seized cocaine, money and guns, and arrested Jimmy Sweeney and his brother, Joseph Sweeney. Joseph Sweeney cooperated with the arresting officers and pledged to do what-

ever it would take to ensure that Jimmy would not face drug charges, including working with police to buy illegal narcotics as part of an undercover investigation (controlled buys). Joseph Sweeney (Sweeney) successfully completed two controlled buys in Pontiac and was advised that he had "worked off" his brother Jimmy's drug charges.[1]

Thereafter, Sergeant Ken Quisenberry of the Oakland County Sheriff's Department, who was then assigned to the Narcotics Enforcement Team (NET),[2] asked Sweeney to serve as a paid informant.[3] Detective Sergeant Gary Miller of the Oakland County Sheriff's Department and Sgt. Quisenberry discussed with Sweeney drug trafficking in Oakland County. Sgt. Miller mentioned Puertas and advised Sweeney that Puertas was dealing narcotics out of his business, the Megabowl bowling alley. Sweeney offered to try to buy cocaine from Puertas at the Megabowl.

The prosecution maintains that between August 19 and August 30, 1997, Sweeney successfully completed four controlled buys of cocaine from Puertas, Talley or both. The amount of cocaine ranged between one-quarter and three-quarter ounces per buy. Sgt. Quisenberry and Sweeney testified that Sweeney was searched to ensure that he had no drugs or money on his person or within his control before each buy was attempted. Sweeney was followed from the time he was given the money to purchase the drugs until he turned over any evidence of a drug purchase. For each transaction after the initial controlled buy, Sgt. Quisenberry had one or more officers inside the Megabowl whose duty it was to observe Sweeney upon his entry into the Megabowl. For two of these four controlled buys, the sole surveillance officer assigned to observe the transactions within the Megabowl was Oakland County Deputy Sheriff Kenneth Everingham. On one other occasion, Deputy Everingham was assigned surveillance with another member of the Oakland County Sheriff's Department, Sergeant Chris Yuchasz.

Between August 31 and September 24, 1997, Sgt. Quisenberry, through Sweeney, attempted five or six additional controlled buys without success. On September 25, 1997, Sweeney successfully completed a fifth controlled buy. This time, Sgt. Quisenberry personally drove Sweeney to the Megabowl, followed Sweeney into the Megabowl and joined Sgt. Yuchasz to conduct surveillance from within the Megabowl.[4]

Sweeney successfully completed a sixth controlled buy on November 18, 1997. Again, Sgt. Quisenberry followed Sweeney into the Megabowl and joined two other officers to conduct surveillance of the interaction between Sweeney and Puertas. This transaction yielded two "coin envelopes containing cocaine."

After the November 18 transaction, Sgt. Quisenberry sought and obtained search warrants to search the Megabowl and other locations where defendants

---

1. Neither Jimmy Sweeney nor Joseph Sweeney was ever charged with any crime arising from the August 7, 1997 raid of Jimmy's house.

2. The NET was described at trial as a Michigan State Police coordinated program that brought together officers from eight different law enforcement agencies in Oakland County.

3. Sweeney was paid from $40 to $150 for participating in each successful controlled buy involving defendants.

4. Sgt. Quisenberry followed Sweeney out of the Megabowl. Sgt. Quisenberry was surprised when Sweeney produced one-quarter ounce of cocaine because, from what Sgt. Quisenberry was able to observe, it did not appear that a transaction took place.

were observed during the investigation. Search warrants were issued for twelve different locations and, on December 16, 1997, the warrants were executed. This search involved approximately 110 investigators and two dogs purportedly trained to alert to the scent of certain illegal narcotics. The two dogs alerted to nine different safes, although no drugs were found in any of these safes. The officers in charge of the dogs testified that their dogs would alert to the trace odor that lingers even after drugs have been removed from a place. Subsequent to the search, the Oakland County Prosecutor filed a forfeiture action against the Megabowl and almost two million dollars in cash and property seized during this raid.[5]

. . . .

At trial, the prosecution's theory was that Puertas and Talley conspired with each other to sell cocaine to Megabowl customers, which the police confirmed through Sweeney's controlled buys. In contrast, Puertas and Talley claimed that they were innocent and that the prosecution's motivation in bringing the criminal charges was to provide a basis for the civil forfeiture action. The jury rejected defendants' claims that they were innocent, except that Talley was found not guilty of the conspiracy charge.

*People v. Puertas,* No. 224173, at 2–4, 2002 WL 31160304 (Mich.Ct.App. Sept.27, 2002) (footnotes in original).

On December 2, 1999, the trial court sentenced Petitioner to two to twenty years in prison for operating a criminal enterprise and two to forty years in prison on each of the six delivery counts. All of the sentences were to run consecutively. The trial court vacated Petitioner's conspiracy conviction because co-defendant Talley was acquitted of conspiracy.

Petitioner raised his habeas claims in a direct appeal to the Michigan Court of Appeals. While his appeal was pending, he sought an un-redacted copy of a state police report concerning an investigation into allegations of public corruption in this case. The trial court granted Petitioner's motion and authorized the release of the unredacted state police report. Petitioner moved for a new trial after he received the report. On May 8, 2000, the trial court granted Petitioner's motion and set aside Petitioner's convictions on the grounds that the prosecution had violated the court's discovery order and withheld evidence favorable to the defense. The prosecution then filed a cross appeal in which it challenged the trial court's decision. On September 27, 2002, the Michigan Court of Appeals upheld the judgment acquitting Petitioner of conspiracy, but affirmed Petitioner's other convictions and reversed the trial court's grant of a new trial. *Puertas,* Mich. Ct.App. No. 224173, at 17. Petitioner appealed the decision by the Michigan Court of Appeals to the Michigan Supreme Court. On May 22, 2003, the Michigan Supreme Court denied leave to appeal because it was not persuaded that the questions presented should be reviewed. *People v. Puertas,* 468 Mich. 907, 661 N.W.2d 583 (2003). On October 24, 2003, the Michigan Supreme Court denied Petitioner's motion for reconsideration. *See People v. Puertas,* 468 Mich. 907, 670 N.W.2d 670 (2003).

Meanwhile, on June 23, 2003, Petitioner filed his habeas corpus petition in this Court claiming the following grounds for relief:

I. Where the prosecutors and the police were aware of an investigation into public corruption in the investigation of the petitioner, they were constitutionally obligated to give the

---

**5.** *See In re Forfeiture $1,923,235,* 247 Mich. App. 547, 637 N.W.2d 247 (2001).

defense documents from that investigation which contained exculpatory and impeaching materials. The state's appellate courts erred in finding that the prosecution was not required to turn over impeaching materials and in grafting on a requirement that the materials discoverable were ones limited to the case at bar. The decision of the state's appellate courts was contrary to and an unreasonable application of the holding in *Brady, Kyles*, and their progeny.

II. The following comments by the prosecution were so egregious as to render the whole trial fundamentally unfair:

A. The prosecutor improperly argued facts not of record.

B. The prosecutor improperly commented on Petitioner's failure to testify.

C. The prosecution improperly denigrated the defense.

D. The prosecution improperly encouraged the jury to convict Petitioner in order to protect the community.

III. In finding that there was no error in failing to give a requested instruction on the presumption regarding missing evidence, the state court issued an opinion that was an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was also contrary to clearly established federal law as determined by the United States Supreme Court.

IV. In this case in which no drugs were discovered despite the execution of 12 search warrants, the admission of evidence that drug-sniffing dogs had identified the odor of narcotics in the areas searched rendered the trial fundamentally unfair where the evidence had little or no probative value. The failure of the trial court to give the requested cautionary instruction also denied Petitioner fundamental fairness and his right to a properly instructed jury.

A. The evidentiary value of testimony concerning alerts by drug-sniffing dogs is of such little value that its use in the instant case denied Petitioner fundamental fairness under the Fifth Amendment.

B. The court of appeals erred in ruling that the failure to instruct the jury as to the usefulness of the "dog sniff" evidence did not create a miscarriage of justice.

The Court granted Petitioner's motion for bond pending review of his habeas petition. *Puertas v. Overton*, 272 F.Supp.2d 621 (E.D.Mich.2003)(Gadola, J.). Respondents urge the Court to deny the habeas petition for lack of merit in all of Petitioner's claims.

## II. STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Petitioner is entitled to relief only if he can show that the state court's adjudication of his claims on the merits either

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Thus, under § 2254(d), Petitioner must show that the state court's decision "was either contrary to, or an unreasonable application of, [the Supreme] Court's clearly established precedents, or was based upon an unreasonable determination of the facts." *Price v. Vincent,* 538 U.S. 634, 639, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

## III. DISCUSSION

### A. The Brady Claim

Petitioner's first habeas claim alleges that under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution was obligated to provide the defense with the state police report concerning the investigation into allegations of public corruption. Petitioner alleges that the state police report contained exculpatory and impeaching materials.

The Michigan Court of Appeals reviewed this claim and concluded that (1) the trial court erred in concluding that the prosecutor possessed work product of the state police; (2) Petitioner failed to demonstrate that he exercised reasonable diligence to obtain the state police report; and (3) there was not a reasonable probability that the report would have resulted in a different outcome. Petitioner contends that the Michigan Court of Appeals erred in concluding that the prosecution was not required to turn over the state police report and in concluding that discoverable materials are limited to materials in the case at bar. Petitioner argues that the holdings of the Michigan courts were contrary to and an unreasonable application of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and related cases. As discussed below, this Court determines that Petitioner fails to demonstrate that all of the components of a *Brady* claim have been satisfied. Petitioner is therefore not entitled to relief on this claim.

### 1. The Facts

The Michigan Court of Appeals summarized the facts giving rise to Petitioner's first habeas claim as follows:

In June 1998, more than a year before trial, the trial court entered a stipulated supplemental discovery order. This order provided that the prosecution had to give the defense:

a. Any exculpatory information or evidence known to the prosecution regarding any individual, including, but not limited to, the Defendant's wife, children, any plea agreement, grant of immunity or other agreement for testimony in connection with the case.

b. Any and all statements of interviews conducted by the prosecution and/or any investigating police agency from the beginning of the investigation until trial, shall be turned over forthwith, whether in the possession of the Oakland County Prosecutor's Office or any of the police investigating agencies.

c. Any expert, scientific testimony, the names of the witnesses of [sic] any experts or scientific testimony that the

prosecution intends to present in trial in their direct case or rebuttal.

In June 1999, approximately four months before trial, local newspapers published articles in which it was claimed that Everingham, the Oakland County deputy sheriff who allegedly acted as the sole surveillance officer for two of the controlled buys at the Megabowl, had lied at Puertas' preliminary examination and that Sgt. Quisenberry fabricated portions of his reports.

The Michigan State Police immediately commenced a public corruption investigation that ultimately produced a report detailing the investigation. The report documents interviews with numerous individuals involved in the Megabowl investigation or other law enforcement agents who had contact with those individuals. Not all the information directly touched on the case against Puertas and Talley. Some of the information detailed problems Everingham and others were having at work. None of the statements provided a "smoking gun," such as information that Quisenberry provided Sweeney with cocaine before the controlled purchases to frame Puertas and Talley. However, the report may fairly be characterized as having impeachment value to the defense as it relates to the credibility of some of the key players in the Megabowl investigation.

At the conclusion of an extensive eleven-week investigation, the Michigan State Police concluded that Everingham's allegations were "unfounded." Persuasive to the investigating officer was the lack of evidence, documents, or other support to bolster Everingham's claims. This investigation closed on September 23, 1999, approximately two weeks before the first day of trial.

. . . .

Prior to sentencing, defense counsel obtained a redacted portion of the State Police's public corruption investigative report, which prompted several post-verdict motions. The trial court denied the defense motions for directed verdict of acquittal with respect to all but Puertas' conviction of conspiracy to deliver cocaine. Both defendants had also moved the trial court to grant them a new trial because of what they viewed as improper profile evidence related to the drug-sniffing dogs, prosecutorial misconduct during closing arguments, and the prosecution's discovery violation in failing to give the defense the State Police's public corruption investigative report. The trial court initially rejected each of these grounds.

While the appeals were pending, the trial court granted Puertas and Talley's joint motion for additional discovery concerning the State Police's public corruption investigative report. The prosecution claimed not to have a copy of the report, but the parties stipulated to an order compelling the Michigan State Police to provide a complete copy of the report for the trial court to review in-camera. The trial court also provided defendants a copy of the portion of the report concerning Everingham's allegations against Quisenberry.

On rehearing of the motion for a new trial, the trial court concluded that by failing to provide defendants a copy of the State Police public corruption investigative report, the prosecution had committed a *Brady* [*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] violation and also violated the pretrial discovery order, thus undermining the reliability of the trial's outcome. The trial court set aside defendants' convictions and reinstated their bonds pending the new trial. The prosecution filed a cross-appeal as of right from the trial

court's order granting defendants a new trial.

*Puertas,* Mich. Ct.App. No. 224173, at 3–5.

### 2. Analysis

The Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

■■■ A *Brady* violation has three components: [1] "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The Supreme Court has recently explained that, "[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Banks v. Dretke,* 540 U.S. 668, ——, 124 S.Ct. 1256, 1264, 157 L.Ed.2d 1166 (2004). The Supreme Court has further stated that

[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). Materiality must be determined by evaluating the evidence collectively, not item by item. *Id.* at 436, 115 S.Ct. 1555.

### a. Evidence Favorable to the Accused

■■■ The first component of the *Brady* test is satisfied because some of the evidence in the state police report could have been used as impeachment evidence. The duty to disclose evidence "encompasses impeachment evidence as well as exculpatory evidence." *Strickler,* 527 U.S. at 280, 119 S.Ct. 1936 (citing *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375). Assuming that the trial court would have permitted Petitioner to refer to the state police report, Petitioner could have used the report to question witnesses about the integrity of the investigation in this case. Defense counsel could have asked witnesses, or called additional witnesses to testify, about: (1) Sergeant Quisenberry's comment in the report that he did not keep notes on each narcotics transaction (Pet'r App. at 53a); (2) former NET commander Mark Menghini's comments to the state police investigator that (a) Sergeant Quisenberry had said "a deal had to be reached" and "some of the information within the investigation was not really the way things were observed," (b) Sergeant Quisenberry "conducted a sloppy investigation and cut too many corners," and (c) all the narcotics

purchases were conducted by an informant who was not very good and who conducted his buys without involvement from undercover officers (*Id.* at 57a); (3) Everingham's and Lieutenant William Kuyck's opinions that the informant was unreliable (*Id.* at 61a and 63a); (4) Everingham's assertion that his boss, Sergeant Jim Ahern, told him to "shut up" and to do as he was told when Everingham expressed his concerns about the case (*Id.* at 61a); and (5) Chris Yuchaz's and Everingham's allegations that Sergeant Quisenberry instructed them to record overtime that was not worked, and listed their names as surveillance on the police reports (*Id.* at 68a).

Petitioner alleges that the Michigan Court of Appeals incorrectly concluded that impeachment evidence was not favorable evidence. The Michigan Court of Appeals did state that, "[a]t best, the information revealed in the State Police's report was collateral or impeaching evidence; not exculpatory evidence." *Puertas*, Mich. Ct.App. No. 224173, at 7. The Michigan Court of Appeals, however, also stated that the state police report was "potentially beneficial to [the defendants] by way of suggesting possible avenues for impeachment of prosecution witnesses." *Id.* at 8 n. 10. Additionally, the Michigan Court of Appeals stated that "the report may fairly be characterized as having impeachment value to the defense as it relates to the credibility of some of the key players in the Megabowl investigation." *Id.* at 4. Consequently, the Michigan Court of Appeals did recognize that impeachment evidence is within the scope of *Brady* and that the evidence in this case was favorable to the accused. Thus, this component of the test has been satisfied.

### b. Suppression by the Prosecution

■ The second component of the *Brady* test requires the Court to determine if the state suppressed the evidence. The Michigan Court of Appeals determined

that the state did not possess the evidence, and therefore did not suppress it. Petitioner contends that the Michigan Court of Appeals grafted a new requirement onto *Brady* when the court stated that the duty to learn of evidence favorable to the defense is limited to evidence "known by government actors *working on the same case.*" *Puertas*, Mich. Ct.App. No. 224173, at 6 (citing *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555) (emphasis in original). The Michigan Court of Appeals then stated that

> [i]n this instance, the investigation by the State Police was not taking place on behalf of the Oakland County Prosecutor. In fact, these proceedings may fairly be characterized as being adverse to the Oakland County Sheriff's Department. Thus, it is unreasonable to impute to the prosecutor or the Sheriff's Department possession of the work product resulting from the State Police's public corruption investigation. Admittedly, the prosecutor and those police officers assisting in building the prosecution's case against defendants were aware of the State Police investigation into Everingham's allegations of public corruption. However, such knowledge does not support the conclusion that the work product the State Police generated in the public corruption investigation was ever in the hands of the Oakland County Prosecutor or the law enforcement officers involved in the Puertas and Talley investigation, or that those actors were in a position to demand possession of the State Police work product. The trial court thus erred in charging the prosecutor with possession of the report.

*Id.*

The record supports the finding by the Michigan Court of Appeals that the prosecution did not possess the unredacted state

police report before or during trial. After trial, the parties stipulated that the state police should forward a complete, unredacted copy of its report to the trial court for *in camera* review. The trial court then reviewed the report and stated that it was discoverable.

■ Prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555. This duty, however, does not extend indefinitely beyond the scope of the case. The Michigan Court of Appeals concluded that possession of the state police report could not be imputed to the prosecutor or to the Sheriff's Department. This conclusion is not unreasonable. The state police were independently investigating allegations that events leading to the prosecution of Petitioner were tainted by public corruption. This investigation was not conducted by the prosecutor and could even be considered adverse to the Sheriff's Department involved in Petitioner's case. Thus, Petitioner has not demonstrated that the prosecutors or relevant police officers possessed the information. Therefore, this component of the *Brady* claim has not been demonstrated. Even if this component were satisfied, the following section demonstrates that the undisclosed evidence does not satisfy the third *Brady* component of prejudice.

### c. Prejudice

■ Petitioner alleges that, if he had reviewed the state police report before trial, he would have conducted additional investigation and called witnesses to comment on (1) informant Joseph Sweeney's lack of credibility, (2) allegations that overtime reports were falsified to corroborate surveillance reports, (3) the flawed and sloppy investigation, and (4) the use of an incredible informant for whom there was no undercover surveillance. Petitioner alleges that, without the report, he was unaware that (1) Sergeant Quisenberry did not keep notes on the individual drug transactions, (2) Sweeney had agreed to do anything that the police wanted him to undertake, (3) Sweeney made a contrary statement as to who identified Petitioner as a suspect, (4) a deputy sheriff stated that, some years earlier, he had been advised by one of the officers involved in the Puertas investigation to "flower up" affidavits when requesting search warrants and that judges expect police officers to lie when applying for search warrants; and that (5) Sergeant Quisenberry told the state police investigator that he paid Sweeney between $150 to $200, whereas Sweeney testified that he paid Sweeney $50 for the first transaction and $40 for the fourth transaction. The Court concludes that Petitioner was not prejudiced by the alleged suppression of the state police report.

First, although the state police report could have been used to impeach the testimony of Sergeant Quisenberry and informant Joseph Sweeney, both witnesses were examined and cross-examined extensively at trial. Sweeney testified that he was addicted to drugs and alcohol, that he had been convicted of two felonies involving dishonesty, and that, in preparation for his testimony, the police and the prosecutor helped him piece together the details of the alleged transactions with Defendants. Sweeney also testified that he told the police that he would do whatever it took to alleviate the charges against his brother and that neither he nor his brother were prosecuted for their involvement with controlled substances. Defense counsel elicited testimony that Sweeney had trouble with his memory, that he became an informant for the money, that he bought drugs for personal use subsequent to conducting buys for the police, and that, initially, he did not inform Sergeant Quisenberry that

he was buying drugs from the same dealers that he had set up for Quisenberry.

Sergeant Quisenberry was cross-examined about a false accident report, a disciplinary charge initiated by the Sheriff's Department in an unrelated matter, and accusations that he created false police reports in this case. He was asked about his failure to (1) obtain fingerprint evidence, (2) photocopy money used for the controlled buys, and (3) make an audiotape or videotape of the transactions with Defendants. Although Sergeant Quisenberry testified that law enforcement officers provided surveillance during the narcotics transactions, neither Quisenberry nor Sweeney knew of anyone who actually saw Sweeney receive narcotics from Defendants. Even Quisenberry, who provided surveillance on two occasions, failed to observe Defendants provide Sweeney with cocaine. Because each witness's credibility was seriously questioned and because the state police report would have merely furnished additional bases on which to challenge the witnesses, the undisclosed evidence is deemed cumulative and not material. *Byrd v. Collins,* 209 F.3d 486, 518 (6th Cir.2000) (quoting with approval *United States v. Avellino,* 136 F.3d 249, 257 (2d Cir.1998)).

Second, the defense knew or should have known about the existence of the state police report. Petitioner alleges that the defense was unaware of the state police investigation concerning his prosecution. On June 18, 1999, however, Petitioner's attorney was quoted in an Oakland County newspaper article that stated the Michigan State Police were investigating Everingham's allegations. *See* Resp't App. F.[6] On the same day, the *Detroit Free Press* reported that the Michigan State Police were investigating Everingham's allegations that Sergeant Quisenberry lied and fabricated police reports in the case against Petitioner. *See id.* Furthermore, at trial, Petitioner's attorney cross-examined Sergeant Quisenberry about certain accusations that Quisenberry had created false police reports. (Tr. Oct. 22, 1999, at 209–12).

Petitioner nevertheless alleges that the existence of the state police report did not become known until after the verdict, when a newspaper employee obtained part of the report and forwarded it to the defense. The fact that a newspaper employee was able to obtain part of the report illustrates that the report was "not wholly within the control of the prosecution." *Coe v. Bell,* 161 F.3d 320, 344 (6th Cir. 1998). When the prosecution does not have complete control of information, *Brady* does not apply. *Id.*

Third, much of the information that Petitioner sought to use for impeachment purposes was available to the defense through transcripts of the preliminary examination or depositions taken in the civil forfeiture case against Petitioner. *See, e.g.,* Resp't App. G (transcript of Oakland County Deputy Sheriff Gary McClure's deposition in which McClure discusses untruthful information in search warrants, reports of surveillance when none was conducted, and the standard payment given to an informant for a controlled buy); Resp't App. H (transcript of Everingham's deposition, which includes comments about Sweeney's lack of credibility, Everingham

---

6. The article reported that Everingham recently denied witnessing a drug sale involving Petitioner. According to the article, Petitioner's attorney responded to the news in the following manner:

As I've been saying all along, Mr. Puertas is not guilty and the events coming out now clearly show that.... The police are telling on the police and when it's all over, my client will be vindicated like we said from the beginning.

(Resp't App. F.)

not performing surveillance on August 26, 1997 despite the fact that the police report listed him as a surveillance officer on that date, falsification of overtime reports, Lieutenant Menghini's concerns about the case, and Sergeant Ahern's unwillingness to listen to Everingham's concerns); and Resp't App. J (transcript of Christopher Lanfear's deposition in which he explains the proper procedures for dealing with informants and execute search warrants). The United States Court of Appeals for the Sixth Circuit has stated that "[t]here is no *Brady* violation where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available ... from another source, because in such cases there is really nothing for the government to disclose." *Coe*, 161 F.3d at 344 (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991)) (quoting *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir.1988)); *See also Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir.2004) (holding "that because the evidence was available to [the habeas petitioner] from other sources than the state, and he was aware of the essential facts necessary for him to obtain that evidence, the *Brady* rule does not apply").

Finally, the state police report was not entirely favorable to Petitioner. Had Petitioner introduced the state police report, the prosecutor could have pointed out that some of the people interviewed by the state police investigator contradicted Everingham's allegations of misconduct. Other interviewees noted that Everingham failed to raise his concerns about the case while the investigation of Petitioner was ongoing. Former NET commander Mark Menghini informed the state police investigator that Petitioner's defense team was "receiving help from within the Oakland County Sheriff's Department from current and former Deputies" and that "[t]he information [was] being twisted to damage the State's case whenever possible." *See* Pet'r App. at 57a. Menghini also stated that Everingham testified at the preliminary examination with the same information and passion that he reported throughout the investigation and that it was only after Everingham left the Sheriff's Department that he changed his story and committed perjury. (*Id.* at 58a). Retired Sergeant Mark Goodrich told the state police investigator that Everingham had informed him that Everingham planned to use Petitioner's case as leverage against the Sheriff's Department. (*Id.* at 70a). The state police investigator ultimately concluded that Everingham's allegations concerning the search warrants and misconduct in the Sheriff's Department were unfounded.

In the words of the Michigan Court of Appeals,

> [w]hile there is much in the report that defendants could have used to impeach many government witnesses, this information must be balanced against the information within the report favorable to the prosecution. Chief among the information favorable to the prosecution are the multiple reports that Everingham was a less than responsible employee of the Sheriff's Department, that Everingham was suffering the consequences of a severe gambling problem, and, in conclusion, that Everingham's accusations pursuant to the Puertas investigation were "unfounded." Add to that the confirmation from Sweeney that he actually obtained cocaine from defendants at the Megabowl on six occasions, and the report, considered in total, is indeed a double-edged sword.

*Puertas*, Mich. Ct.App. No. 224173, at 6 n. 8.

This Court agrees with the Michigan Court of Appeals that there is not a reasonable probability that the result of the

proceeding would have been different had the state police report been disclosed before trial. Disclosure of the disputed evidence would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. Therefore, Petitioner has not satisfied all three components of a *Brady* claim, and the refusal by the Michigan Court of Appeals to grant relief on this claim was not contrary to or an unreasonable application of clearly established federal law.

## B. The Prosecutor's Statements

The second habeas claim attacks the prosecutor's remarks during closing arguments. Petitioner alleges that the prosecutor argued facts not of record, commented on Petitioner's failure to testify, denigrated the defense, and encouraged the jury to convict Petitioner in order to protect the community.

█ For habeas relief to be granted, prosecutorial misconduct must have infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Byrd*, 209 F.3d at 529 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974))). "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Id.* (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997)). In addition, prosecutorial misconduct may be reviewed for harmless error. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir.2003) (citing *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir.1999)). The Court is mindful that the Sixth Circuit "has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument."

*Wilson v. Mitchell*, 250 F.3d 388, 399 (6th Cir.2001).

### 1. Arguing Facts not in Evidence

█ During his rebuttal argument, the prosecutor suggested that Petitioner planted a bag of harmless white power in a safe as an insult to the police. The prosecutor stated, "I'll tell you what this bag of white powder is right here. This bag of white powder, which is not a controlled substance, but is in the safe, is a dig from that man who knew we were coming and that's why this is in here." (Tr. Oct. 28, 1999, at 265). Petitioner contends that the comment was not supported by the evidence and that it implied he was a drug dealer, who hid evidence from the police and substituted white powder in its place. The trial court opined that the comment was improper, but not a basis for a mistrial. (Tr. Oct. 29, 1999, at 14–15). The Michigan Court of Appeals likewise determined that the comment did not warrant relief.

█ The Supreme Court has stated that prosecutors may not make improper suggestions, insinuations, or assertions and that they have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Additionally, "[s]tatements by a prosecutor in a closing argument are not proper if they bring to the attention of the jury facts not in evidence." *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir.2001), *cert denied*, 535 U.S. 977, 122 S.Ct. 1450, 152 L.Ed.2d 392 (2002).

█ The evidence in this case established that Petitioner sold cocaine to Sweeney and that dogs alerted to Petitioner's closed safes, despite the fact that no drugs were found there. Moreover, the day manager of the Megabowl testified that she never saw white powder in the safe

and that she kept her white exercise supplement in a desk drawer, not the safe. (Tr. Oct. 28, 1999, at 46–47, 51, 77–78, 82). A reasonable inference from the evidence was that Petitioner suspected a police raid, removed cocaine from the safes, and substituted a harmless white power for the cocaine. As the Sixth Circuit has stated, "counsel must be given leeway to argue reasonable inferences from the evidence." *United States v. Collins,* 78 F.3d 1021, 1040 (6th Cir.1996). Therefore, the conclusion of the Michigan Court of Appeals that the comment did not warrant relief was not contrary to, or an unreasonable application of, Supreme Court decisions concerning prosecutorial misconduct.

### 2. Comment on Failure to Testify

 Immediately before or during an argumentative bench conference, the prosecutor apparently asked defense counsel whether his client was going to take the stand or why he did not take the stand. The comment was not transcribed by the court reporter, but on the following day, defense counsel informed the trial court that he had heard the remark when he played a tape recording of the proceedings. Defense counsel admitted that he did not hear the comment when it was made, but he claimed that someone in the audience had heard the remark and he thought that the jury had heard it. The trial court said that it had not heard the comment, and the prosecutor maintained that his remark had not been loud enough for the jury to hear. (Tr. Oct. 29, 1999, at 3–4, 6–7, 13–14). Petitioner contends that the prosecutor's comment was an improper reference to his failure to testify. The Michigan Court of Appeals adjudicated Petitioner's claim and denied it.

The Fifth Amendment states that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment is applicable to the states, and has been interpreted as forbidding comments on a defendant's silence. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

The record indicates that the prosecutor was making his closing argument when defense counsel objected to something the prosecutor said. The trial court consequently advised the attorneys to approach the bench. Petitioner then got out of his chair and said that "they" had been lying and that he could not take these lies anymore, or something to that effect. The prosecutor allegedly turned to Petitioner's attorney with his back to the jury and said, "Is Mr. Puertas going to take the stand?" (Tr. Nov. 17, 1999, at 24–25).

Neither defense counsel nor the trial court heard the remark, and the trial court doubted that the jury heard it because of all the yelling that was going on when the remark was made. The trial court described the comment as something like, "Is Mr. Puertas going to testify?" The trial court noted that the jurors were questioned repeatedly during *voir dire* on whether they understood that a defendant does not have to take the stand and, if he does not testify, the jurors could not hold it against him. (Tr. Oct. 29, 1999, at 13–14).

The trial court subsequently charged the jury that every defendant has an absolute right not to testify and that the jurors should not consider the fact that Defendants did not testify. The court specifically instructed the jurors that the failure to testify must not affect their verdict in any way. (*Id.* at 22). Earlier, before any testimony was taken, the trial court had instructed the jurors that the defense did not have to offer any evidence and that the jurors should pay no attention to discussions which occurred between the attorneys and the court out of their hearing. (Tr. Oct. 12, 1999, at 5, 9–10).

This Court concludes that the prosecutor's comment could not have had a "substantial and injurious effect or influence" on the jury's verdict and was harmless. *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The jurors likely did not hear the remark, and even if they did hear it, they were instructed not to consider Petitioner's failure to testify. Therefore, the state appellate court's conclusion that relief was not warranted did not result in a decision that was contrary to or an unreasonable application of *Griffin.*

### 3. Denigrating the Defense

■ Petitioner next argues that the prosecutor denigrated the defense by suggesting that defense counsel was trying to mislead the jury. Petitioner notes that the prosecutor accused defense counsel of distracting the jury with "smoke and haze," "sound and fury," "bombastic antics," and innuendo. (Tr. Oct. 28, 1999, at 165–66, 173–74). The prosecutor also said that Defendants had tried to create a defense where none existed. (*Id.* at 264).

Although prosecutors may not make "unfounded and inflammatory attacks on the opposing advocate," *United States v. Young,* 470 U.S. 1, 9, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Michigan Court of Appeals determined on review of Petitioner's claim that Petitioner forfeited the issue by not objecting to the comments during trial. The Sixth Circuit has stated that if "a habeas petitioner fails to obtain consideration of a claim by a state court ... due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review." *Seymour v. Walker,* 224 F.3d 542, 549–50 (6th Cir.2000) (citing *Wainwright v. Sykes,* 433 U.S. 72, 80, 84–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Picard v. Connor,* 404 U.S. 270, 275–80, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Procedural default requires three elements: "(1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim." *Willis v. Smith,* 351 F.3d 741, 744 (6th Cir.2003) (citing *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986)).

Petitioner failed to comply with a state procedural rule that requires defendants to preserve their claims for appellate review by raising them in the trial court. *See People v. Carines,* 460 Mich. 750, 761–62, 597 N.W.2d 130, 137 (1999); *People v. Grant,* 445 Mich. 535, 546, 520 N.W.2d 123, 128 (1994). The last state court to review Petitioner's claim in a reasoned opinion was the Michigan Court of Appeals. It enforced the state procedural rule when it stated, "this claim of error is forfeited." *Puertas,* Mich. Ct.App. No. 224173, at 17. The state court's alternative holding that Petitioner's argument also failed on its face does not preclude this Court from concluding that Petitioner's claim is procedurally defaulted. *Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The contemporaneous-objection rule was an adequate and independent state ground for the state court's decision because the rule was "firmly established and regularly followed" when it was applied. *Rogers v. Howes,* 144 F.3d 990, 992 (6th Cir.1998) (quoting *Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)). Thus, all three elements of procedural default are satisfied.

The Court may excuse a petitioner's procedural default only if he demonstrates cause for the default and prejudice attrib-

utable thereto or that a fundamental miscarriage of justice will occur if the Court fails to consider the federal claim. *Coleman v. Thompson,* 501 U.S. 722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Petitioner implies that an objection would have highlighted the error and that a cautionary instruction would have been ineffective. Defense counsel, however, could have objected at a bench conference or in the jury's absence, and a timely cautionary instruction likely would have been effective, as juries are presumed to follow their instructions. *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The Court therefore concludes that Petitioner has failed to show cause for his failure to object to the allegedly denigrating remarks.

Because Petitioner failed to establish cause to excuse his procedural default, the Court need not determine if Petitioner has been prejudiced. *Willis,* 351 F.3d at 746 (citing *Simpson v. Jones,* 238 F.3d 399, 409 (6th Cir.2000)) (citing *Smith v. Murray,* 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Long v. McKeen,* 722 F.2d 286, 289 (6th Cir.1983)). Furthermore, the exception for miscarriages of justice does not apply because Petitioner has not submitted any new and reliable evidence of actual innocence. *Id.* (citing *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). Accordingly, Petitioner's claim about denigrating the defense is procedurally defaulted.

**4. The Alleged Civic Duty Argument**

Petitioner's final allegation about the prosecutor's statements is that the prosecutor encouraged the jury to convict Petitioner in order to protect the community. The Michigan Court of Appeals did not discuss this claim, although Petitioner raised it in his appellate brief. Because no state court analyzed the claim, this Court must review the claim *de novo. Maples v.*

*Stegall,* 340 F.3d 433, 436–37 (6th Cir.2003) (citing *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2542–44, 156 L.Ed.2d 471 (2003)).

The Court looks to *Viereck v. United States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), as a guide for determining whether a prosecutor intended his comments to incite prejudice and passion in the jury. *Emuegbunam,* 268 F.3d at 406. The prosecutor in *Viereck* exhorted the jury as follows:

In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps. This is war. It is a fight to the death. The American people are relying on you ladies and gentlemen for their protection against this sort of a crime, just as much they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

As a representative of your Government I am calling upon every one of you to do your duty.

*Viereck,* 318 U.S. at 247 n. 3, 63 S.Ct. 561.

In contrast, the prosecutor at Petitioner's trial said to the jury:

After this case is done and then you are able to go home and talk to your loved ones about what the case was about or your neighbors or whoever it is and you get there and you're in your backyard and you're leaning over the fence and you're talking to your neighbor and you say, yep, I just got done with this jury

duty and we had this very interesting case. It was a drug case and a racketeering case and a conspiracy case and the Prosecutor had the actual person who bought the drugs from the two defendants and he had officers who actually witnesse[d] the transactions happen and they had $106,000.00.

. . . .

And they had $106,000 of drug tainted money. Drug dogs alerted to the safes where the money was kept. And you turn to your neighbor and your neighbor says, well what happened? And you say well we found him not guilty. And your neighbor says what?

(Tr. Oct. 28, 1999, at 267–68). These remarks do not rise to the level of the argument made in *Viereck.* The prosecutor's statements in this case list the evidence against Petitioner and appeal more to the jury's common sense than to the jury's fear of community safety.

Furthermore, the trial court sustained defense counsel's objection and then instructed the jurors not to consider the remarks about any discussion they might have with their neighbors. (Tr. Oct. 28, 1999, at 270). The alleged error was cured when the trial court struck the remark from the record and instructed the jury to disregard it. *See Marsh,* 481 U.S. at 211, 107 S.Ct. 1702 (noting that juries are presumed to follow their instructions); *United States v. Roberts,* 986 F.2d 1026, 1031 (6th Cir.1993) (stating that "the prejudicial effect of improper comments may be negated by curative instructions to the jury"). Petitioner has no right to habeas relief on the basis of his "civic duty" claim because the alleged prosecutorial misconduct did not infect Petitioner's trial with such unfairness as to deprive Petitioner of due process.

## C. Jury Instructions on Missing Evidence

Informant Sweeney made controlled buys of narcotics for the police in Pontiac, Michigan on August 7 and 12, 1997. Sweeney alleged that he did this to avoid having his younger brother prosecuted for violating the state's narcotics laws. At trial, defense counsel asked the prosecution for copies of the affidavits that were prepared as support for the search warrants in the Pontiac cases. The prosecution maintained throughout trial that it was unable to locate the affidavits, despite diligent efforts. Defense counsel finally asked the trial court "for some kind of instruction to the jury" on the missing affidavits. (Tr. Oct. 19, 1999, at 8). The trial court refused to give the instruction, but it permitted defense counsel to make the argument to the jury. (Tr. Oct. 28, 1999, at 143).

Petitioner claims that he was entitled to an instruction that the prosecution failed to preserve the affidavits and that the jury could infer the evidence would have been favorable to the defense. Petitioner asserts that the affidavits would have provided additional information on the working relationship between Sweeney and law enforcement officials and on Sweeney's reliability or credibility. The Michigan Court of Appeals concluded on review of Petitioner's claim that the trial court properly denied Petitioner's request for a jury instruction on the issue.

The question on habeas review is whether the allegedly defective jury instructions "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). A federal court may not grant the writ of habeas corpus on the basis that a jury instruction was incorrect under state law. *Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Fur-

thermore, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). It is also well established that the jury instructions must be considered as a whole. *McGuire*, 502 U.S. at 72, 112 S.Ct. 475.

 The disputed affidavits were not prepared for this case; they were submitted in unrelated criminal matters. They pertained to other parties, other locations, and other dates, and they were prepared before the police asked Sweeney to work with them on an investigation of Petitioner. Furthermore, the two defense attorneys were given ample opportunities to cross-examine Sweeney and Sergeant Quisenberry regarding Sweeney's reliability and credibility.

The Court concludes that the lack of a jury instruction on the missing affidavits did not deprive Petitioner of due process or a fair trial. Therefore, the trial court's refusal to give the requested instruction, and the state appellate court's conclusion that the trial court did not abuse its discretion, did not result in decisions that were contrary to, or an unreasonable application of, Supreme Court precedent.

### D. Dog Sniff Evidence

The fourth and final habeas claim pertains to the admission of evidence that specially trained dogs reacted to the odor of narcotics during a search of the Megabowl and Petitioner's storage facility. When adjudicating this claim, the Michigan Court of Appeals explained that

> [t]wo dogs trained to alert to the scent of narcotics were utilized during the execution of the search warrants. The prosecutor offered four witnesses relative to these dogs. Two witnesses, Dr. Stefan Rose, M.D. and Dr. Kenneth G. Furton, Ph.D. (the forensic experts), were qualified by the Court to offer expert opinions relating to what caused the dogs to alert to safes that contained currency but no illegal narcotics and to opine about the adequacy of the training of the dogs. Defendants objected to these witnesses both by way of a pretrial motion and at trial when the witnesses were called to testify. The prosecution also called two witnesses charged with handling the dogs (the canine patrol officers). Each canine patrol officer testified to the training of his particular dog and to the fact that his dog had alerted to one or more safes located on the searched premises. Although no narcotics were found in the safes to which each dog alerted, the witnesses were permitted to opine that narcotics must have recently been inside the safes in order to cause the dogs to alert. Defendants objected during trial to the testimony of these witnesses. Defendants sought a special limiting instruction relating to the drug-sniffing dog evidence. The trial court denied defendants' request for a special instruction.

*Puertas*, Mich. Ct.App. No. 224173, at 10.

### 1. Admission of the Evidence

Petitioner alleges that the "dog sniff" evidence had little or no probative value. The Michigan Court of Appeals, however, concluded that the trial court did not abuse its discretion in admitting the evidence and that any prejudice resulting from admission of the evidence did not substantially outweigh its probative value.

The Sixth Circuit has stated that "errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, [usually may not] be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988). "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal

constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 346 F.3d 159, 165–66 (6th Cir.2003) (citing *McGuire*, 502 U.S. at 69–70, 112 S.Ct. 475).

■■■ Petitioner relies on scientific findings that a large percentage of United States currency is tainted with cocaine. Although he did not produce any evidence to support this theory at trial, "the prosecution's expert substantiated this claim for [him]." *Puertas*, Mich. Ct.App. No. 224173, at 11 n. 13. As Petitioner was able to present this theory at trial, the admission of "dog sniff" evidence did not deprive Petitioner of a fair trial.

Furthermore, Petitioner has not cited any Supreme Court decision that prohibits the use of "dog sniff" evidence on constitutional grounds. *But see, United States v. Buchanan*, 213 F.3d 302, 315–18 (6th Cir. 2000) (Jones, J., concurring); *People v. Humphreys*, 221 Mich.App. 443, 447–49, 561 N.W.2d 868, 869–71 (1997). Therefore, the decisions of the trial court and the state appellate court were not contrary to or an unreasonable application of any Supreme Court decision.

### · 2. Refusal to Give a Cautionary Instruction

Petitioner also contends that the trial court should have given a cautionary instruction on "dog sniff" evidence and that the failure to do so deprived him of his right to a properly instructed jury. The cautionary instruction would have warned the jurors to consider drug sniffing evidence with great care. The instruction also would have stated that the evidence has little value as proof and that, if the jurors decided the evidence was reliable, they must not convict either defendant solely on drug sniffing evidence. (Tr. Oct. 28, 1999, at 114).

■■■ As discussed above, the question on habeas review is whether the allegedly defective jury instructions "so infected the entire trial that the resulting conviction violates due process." *Naughten*, 414 U.S. at 147, 94 S.Ct. 396. A federal court may not grant the writ of habeas corpus on the basis that a jury instruction allegedly was incorrect under state law, *McGuire*, 502 U.S. at 71–72, 112 S.Ct. 475, and "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Kibbe*, 431 U.S. at 155, 97 S.Ct. 1730.

■■■ The Michigan Court of Appeals agreed with Petitioner that the trial court should have given the limiting jury instruction requested by Petitioner. The Michigan Court of Appeals concluded, however, that the omission did not result in a miscarriage of justice. In reaching this conclusion, the court noted that

> [t]he evidence relating to the drug-sniffing dogs, standing alone, could not establish the crimes of which [Petitioner was] convicted. An essential element to the charge of delivering cocaine is evidence of the intent to deliver. This evidence was established through the evidence of narcotic sales at the Megabowl, as demonstrated by the controlled buys executed by Sweeney. Likewise, the crime of operating a criminal enterprise is not established merely by evidence of possession of illegal narcotics and large amounts of cash. Rather, the prosecution was required to prove that [Petitioner was] employed or associated with the Megabowl and knowingly participated in the affairs of the Megabowl through a "pattern of racketeering activity" as that term is defined by Mich. Comp. Laws § 750.159f(c). This pattern of racketeering activity was established by the evidence of multiple sales of nar-

cotics from behind the business counter of the Megabowl.[7]

*Puertas,* Mich. Ct.App. No. 224173, at 13–14 (internal footnote omitted, end footnote in original). The Michigan Court of Appeals concluded that the evidence was not a controlling issue, but merely circumstantial evidence that corroborated the six controlled buys of illegal narcotics.

This Court concludes for the reasons given by the Michigan Court of Appeals that the lack of a jury instruction on "dog sniff" evidence did not deprive Petitioner of a fair trial. Consequently, the state court's failure to grant relief did not result in a decision that was contrary to or an unreasonable application of *Naughten.*

## IV. CONTINUATION OF BOND

Pursuant to an order of this Court, Petitioner presently remains on bond. This order provided that:

> If this Court denies Petitioner's petition for a writ of habeas corpus or otherwise terminates these proceedings, and Petitioner seeks further review of the Court's decision, *this Court's July 17, 2003 bond order shall remain in effect for a period of 45 days after such decision denying the petition or terminating these proceedings, or until such time as this Court or an appellate court determines Petitioner's eligibility for bond pending further review pursuant to Federal Rule of Appellate Procedure 23(b).* If Petitioner does not obtain bond pending further review of his petition for a writ of habeas corpus or does not appeal the decision denying the peti-

tion or otherwise terminating these proceedings, Petitioner will surrender himself to the Oakland County Sheriff or other custodial authority, as directed by the Oakland County Circuit Court.

Aug. 19, 2003 Order at 1–2. The Court added this 45 day period "to provide the Court and the parties with a brief period of time following a denial of the petition to assess Petitioner's eligibility for bond on appeal." Aug. 14, 2003 Order at 8. If Petitioner seeks further review of the Court's decision and a continuation of bond, Petitioner shall file a motion for bond within ten (10) days of the filing of the notice of appeal. Respondents shall file a response brief within seven (7) days of the service of that motion. Petitioner may file a reply brief within five (5) days of the service of the response. If Petitioner chooses to file such a motion for bond pending appeal, the Court reiterates that the July 17, 2003 bond order shall remain in effect until the motion for bond pending appeal is decided, even if that period is longer than 45 days, in accordance with the Court's orders of August 14 and 19, 2004.

## V. CERTIFICATE OF APPEALABILITY

The Court also determines that it is appropriate to address the issue of a certificate of appealability at this time. Although the Court determines that Petitioner is not entitled to a writ of habeas corpus, the Court considers the issues raised to be of such a sort "that reasonable jurists could debate whether (or, for

---

7. Moreover, the jury was charged with a cautionary instruction relating to the value and proper use of expert testimony. Because a great deal of the evidence relating to the activities of the drug-sniffing dogs came in through experts, we must presume that the jury considered this testimony in light of the court's expert testimony instruction. Jurors are presumed to follow their instructions.

[*People v.*] *Graves,* [458 Mich. 476, 486, 581 N.W.2d 229 (1998)]. While the expert witness charge does not cover all of the issues addressed in CJI 2d 4.14, it nonetheless ensured that the jury considered whether the experts' testimony made sense when considered in conjunction with all the other evidence presented in the case.

that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (quoting *Barefoot v. Estelle,* 463 U.S. 880 at 893, n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)). Accordingly, the Court will grant a certificate of appealability to Petitioner on all issues.

## VI. CONCLUSION

For the reasons stated above, the Court concludes that Petitioner is not entitled to the writ of habeas corpus. **ACCORDINGLY, IT IS HEREBY ORDERED** that his petition for a writ of habeas corpus [docket entry 1] is **DENIED.**

**IT IS FURTHER ORDERED** that a Certificate of Appealability shall issue for all issues raised by Petitioner.

**IT IS FURTHER ORDERED** that, in accordance with this Court's orders of August 14 and 19, 2003, the July 17, 2003 bond order shall remain in effect for a period of 45 days after the entry of this order, or until such time as this Court or an appellate court determines Petitioner's eligibility for bond pending further review pursuant to Federal Rule of Appellate Procedure 23(b).

**IT IS FURTHER ORDERED** that if Petitioner seeks further review of the Court's decision and a continuation of bond, Petitioner shall file a motion for bond within **TEN (10) DAYS** of the filing of a notice of appeal. Respondents shall file a response brief within **SEVEN (7) DAYS** of service of Petitioner's motion. Petitioner may file a reply brief within **FIVE (5) DAYS** of the service of the response.