NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0235n.06
Filed: April 4, 2006

No. 04-2405

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JOSEPH EDMUND PUERTAS,     )
    )
    Petitioner-Appellant,     )
    )
v.     )
    ) ON APPEAL FROM THE UNITED
WILLIAM OVERTON, Director, Michigan     ) STATES DISTRICT COURT FOR THE
Department of Corrections, NICK     ) EASTERN DISTRICT OF MICHIGAN
LUDWICK, Warden, Egeler Reception and     )
Guidance Center, and MICHAEL     )
BOUCHARD, Sheriff, Oakland County,     )
    )
    Respondents-Appellees.     )

Before: MERRITT, MOORE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. In this habeas action, Joseph Puertas challenges his Michigan

state-court convictions for one count of operating a criminal enterprise and six counts of delivering

less than 50 grams of cocaine. The district court denied the petition. Because the resolution of

Puertas's constitutional claims by the state courts was not contrary to, and did not amount to an

unreasonable application of, Supreme Court precedent, we affirm.

I.

In 1997, when police suspected Puertas of selling drugs from his Oakland County, Michigan

bowling alley, the Megabowl, they hired an informant to confirm their suspicions. Working with

the Michigan State Police, members of the Oakland County Sheriff's Department hired Joseph

Sweeney to purchase cocaine from Puertas at the bowling alley.

At Puertas's state-court trial, police and Sweeney testified that between August 19 and

November 18, 1997, Sweeney completed six controlled buys of cocaine from Puertas or his co-

defendant. Before each buy, the officers searched Sweeney to ensure that he did not possess any

drugs and watched him during his encounters with Puertas. After the sixth buy, police executed

search warrants for 12 locations associated with Puertas. Although the investigators involved in

these coordinated searches did not seize any drugs, two drug-detecting dogs alerted to nine different

safes owned by Puertas. Officers and experts testified at trial that the dogs were most likely alerting

to a lingering odor from drugs that recently had been removed from the safes. The officers also

recovered $1.9 million in cash and property during the searches. Based on this evidence, the jury

convicted Puertas of operating a criminal enterprise and of selling cocaine.

Puertas appealed to the Michigan court of appeals. While that appeal was pending, he

obtained a copy of a state police report investigating allegations of public corruption stemming from,

among other law-enforcement activity, the police investigation of him. The report details interviews

with officers involved in the Puertas investigation and other law-enforcement agents who had

contact with those officers. It concludes that the allegations of public corruption in connection with

the Puertas investigation were unfounded. Although not all of the information in the report directly

concerns Puertas, parts of it concern the credibility of some of the participants in the Puertas

investigation and parts of it contain statements from several of the witnesses in his case. Ruling that

the prosecution had a duty to give Puertas the report before or during trial, the trial court set aside

Puertas's conviction and granted him a new trial.

On appeal, the Michigan court of appeals reversed the decision to grant a new trial and

affirmed Puertas's convictions. *People v. Puertas*, Nos. 224173, 224286, 2002 WL 31160304

(Mich. Ct. App. Sept. 27, 2002). The Michigan Supreme Court denied Puertas's motion for leave

to appeal. *People v. Puertas*, 661 N.W.2d 583 (Mich. 2003).

On June 23, 2003, Puertas filed this habeas petition. The district court denied the petition

but granted a certificate of appealability on all issues. *Puertas v. Overton*, 342 F. Supp. 2d 649 (E.D.

Mich. 2004).

II.

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), we may grant a habeas

petition if the state court's adjudication of the claim "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362,

405 (2000). If "a claim has not been adjudicated on the merits in State court proceedings and has

not been procedurally defaulted, we look at the claim de novo rather than through the deferential

lens of AEDPA." *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (internal quotation marks and

citation omitted).

A.

Puertas first argues that the prosecution violated its duty under the Due Process Clause and *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to provide him with the state police report. To demonstrate a *Brady* violation, (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (internal quotation marks omitted).

The Michigan court of appeals held that Puertas satisfied the first element of a *Brady* claim because the state police report had impeachment value. *Puertas*, 2002 WL 31160304, at *2 ("[T]he report may fairly be characterized as having impeachment value to the defense as it relates to the credibility of some of the key players in the Megabowl investigation."). No one disputes that conclusion. As to the second element of a *Brady* claim, the Michigan court of appeals held that the prosecution did not "suppress" the report because it did not have it. "[T]he prosecutor," the court held, does not have "a duty to learn of all evidence favorable to the defense known to anyone in the course of government work." *Id.* at *5. Rather, the prosecutor's duty is "limited to learning of all evidence favorable to the defense known by government actors *working on the same case*." *Id.* Because the state police investigation did not take place on behalf of the Oakland County prosecutor,

the court held that "it is unreasonable to impute to the prosecutor or the Sheriff's Department possession of the work product resulting from the State Police's public corruption investigation." *Id.* As to the third element of a *Brady* claim, the court concluded that Puertas and his co-defendant "failed to demonstrate that they exercised reasonable diligence to obtain" the report, *id.*, and concluded that "[h]ad the complete report rested in the defense's possession all along, a different result might be considered a possibility, but not a 'reasonable probability,'" as case law requires, *id.* at 5 n.8.

Because the state court's rejection of Puertas's arguments under the third prong of the *Brady* test does not unreasonably apply controlling Supreme Court precedent, we shall address only that aspect of the state court of appeals' decision and shall affirm the district court's decision on that ground alone. In particular, a state court could reasonably conclude that Puertas either knew the substance of the report's contents or knew enough to have discovered that information based upon further inquiry. Approximately four months before Puertas's October 1999 trial, local media reported that the Michigan State Police had commenced a public-corruption investigation. *See* JA 371–75 (June 18, 1999 *Oakland Press* and *Detroit Free Press* articles). The newspapers reported admissions by a former deputy of the Oakland County Sheriff's Department, Kenneth Everingham, that he had lied at Puertas's preliminary examination (about conducting surveillance during some of the controlled buys). *Id.* Everingham also alleged that Sergeant Kenneth Quisenberry, who led the Puertas investigation, had fabricated portions of his reports. *Id.* The 11-week public-corruption investigation closed and produced the report at issue on September 23, 1999, approximately 2 weeks before the first day of Puertas's trial. Puertas has failed to explain why public knowledge of the

investigation and his own attorney's knowledge of this conspicuously pertinent investigation, *see* JA 372 (June 18, 1999 *Oakland Press* article quoting Puertas's attorney's comments on the allegations), did not at a minimum provide him with inquiry notice to seek through pre-trial depositions and other discovery all of the information contained in the report. *See Spirko v. Mitchell*, 368 F.3d 603, 610–11 (6th Cir. 2004) (rejecting *Brady* claim where defendant was "on notice" that evidence existed and "[a] reasonable defendant would have pursued that inquiry"); *United States v. Corrado*, 227 F.3d 528, 538 (6th Cir. 2000) (rejecting a *Brady* claim where the defendant "has made no showing that he would have been unable to identify, locate, and interview these individuals through reasonable efforts on his own part").

Attempting to counter this conclusion, Puertas raises the following arguments. He first points to the report's value in attacking the testimony of the informant, Sweeney, the prosecution's lead witness. With the benefit of the report, he claims, "he would have called additional police witnesses to comment on" Sweeney's "lack of credibility." Puertas Br. at 30. Although Puertas does not specify whom he would have called or which portions of the report would have prompted this action, statements by two officers in the report concern Sweeney's credibility. Everingham stated that he "personally did not believe that [Sweeney] was reliable enough to work this type of investigation." JA 136-e. And Lieutenant Bill Kuyck stated that "he was uncomfortable because he has known [Sweeney] for some time and believes that [he] has no credibility." JA 138. In addition to claiming that he would have called additional witnesses (presumably Everingham and Kuyck) had he been given the report, Puertas submits that the report would have made him "aware," Puertas Br. at 30, that during Sweeney's interview with the investigating officer, Sweeney stated that

"he was agreeable to anything that . . . Quisenberry or Deputy Gary Miller wanted to undertake." JA 141.

Even without having the summaries of the interviews contained in the report in hand before trial, the defense vigorously attacked Sweeney's credibility at trial, exploring and attempting to exploit these precise lines of impeachment. Sweeney admitted that he was addicted to drugs and alcohol and that he had been convicted of two felonies involving dishonesty. *Puertas*, 342 F. Supp. 2d at 659. He testified that he told the police that he would do "whatever it took" to alleviate the charges against his brother and that neither he nor his brother was ultimately prosecuted for their involvement in drug crimes. *Id.* On cross-examination, Sweeney admitted that he had trouble with his memory, that he became an informant for the money and that he bought drugs for personal use after conducting buys for the police. *Id.* Because Sweeney's deposition, preliminary examination and trial testimony all indicated that he would do "whatever it took" to mitigate the charges against his brother, *see* Sweeney Dep. at 237 (June 30, 1998) ("I just told them I would like to get [my brother] off the hook, whatever it took."); Prelim. Exam. Tr. at 53 (Dec. 29, 1997) ("I just told them that . . . whatever it took, I'd help 'em relieve my brother of a criminal record."); JA 492 (trial testimony: "I just told the police officers I would do whatever it took" "[t]o alleviate the charges" against "[m]y brother."), and because this testimony covered the same ground as Sweeney's statement in the report that he was "agreeable to anything" Quisenberry or Miller wanted, the state court did not unreasonably reject this theory of prejudice. *See Spirko*, 368 F.3d at 610 ("[W]here the defendant was aware of the essential facts that would enable him to take advantage of the

exculpatory evidence, the government's failure to disclose it did not violate *Brady*.") (internal quotation marks omitted).

Nor was Puertas prejudiced by not having access to Everingham's and Kuyck's statements in the report, as he had ample opportunities to elicit this information himself before trial. Not only could Puertas have sought to depose these potential government witnesses prior to his criminal trial, but he in fact did depose Everingham in connection with a government-initiated civil-forfeiture action that arose from the criminal investigation. During this deposition, which occurred four months before his criminal trial, and two days before the first newspaper articles about the investigation, Everingham stated that he had "concerns" about the Puertas investigation and stated that he had discussed the investigation with Kuyck. *See* Everingham Dep. at 14 (June 16, 1999); *id*. at 90–91. With this deposition testimony in hand, plus the information later reported by local newspapers about Everingham's allegations, plus Puertas's attorney's knowledge of the state investigation, Puertas not only knew that Everingham had "concerns" about the investigation but also had ample opportunity to develop further support for this theory before trial had he wished.

Puertas separately claims that the report would have made him "aware" that Sweeney "had made a contrary statement as to who identified [Puertas] as a suspect." Puertas Br. at 30. According to the report, Sweeney said that the "decision to investigate" Puertas and his bowling alley "was Deputy Miller's idea." JA 141. But at trial Sweeney testified that he first discussed investigating Puertas with Quisenberry, not Miller, although when pressed he stated that he could not remember if any other officer participated in that conversation. *See* Trial Tr. at 65–66 (Oct. 19, 1999).

In view of the many other ways in which the defense attacked Sweeney's credibility, the advantage that Puertas could have gained by contrasting Sweeney's statement at trial (that Quisenberry first identified Puertas as a suspect) with the statement in the report (that the decision to investigate Puertas was "Miller's idea") arises only at the margins. Additional testimony from police witnesses questioning Sweeney's credibility would have been cumulative and accordingly of slight value. *See Byrd v. Collins*, 209 F.3d 486, 518–19 (6th Cir. 2000). The following cross-examination of Sweeney at trial, at any rate, suggests that the defense already had some knowledge of this statement:

> Q    Yesterday, you testified that you had a discussion about going into the Megabowl, right?
> A    Um hm.  Yes.
> Q    The discussion you said was with Quizenberry [sic] alone, correct?
> A    Correct.
> Q    Miller was there, correct?
> A    I don't remember if he was or not. . . .
> Q    You might have given a different answer at a different time?
> A    I don't know.  I mean I don't remember.

Trial Tr. at 65 (Oct. 19, 1999).

Puertas next claims that he could have used information in the report to attack the credibility of Quisenberry's testimony in three ways. First, he "would have known, and offered as evidence," Puertas Br. at 30, information in the report that one of the commanders of the investigation, Mark Menghini, said that Quisenberry "conducted a sloppy investigation and cut too many corners" and believed that Sweeney "was not very good and all the purchases were conducted by the informant with no undercover involvement," JA 136-a. Second, Puertas says that Quisenberry's statement in the report that "he did not keep dailies or notes on each transaction" amounted to new evidence.

- 9 -

JA 133. Third, while Sweeney testified at trial "that he was paid $50 for the first transaction and $40 for the fourth," Puertas Br. at 31, the report notes that Quisenberry said that Sweeney's payment "would range from $150 to $200 each time" he completed a controlled buy from Puertas, JA 133. This discrepancy, Puertas suggests, shows that Quisenberry might have "ke[pt] the extra $100 or $150 on those two occasions" and that he "was using a phony drug investigation in order to supplement his pay." Puertas Br. at 31–32.

Here too, however, Puertas already knew this information or knew enough about the topic to obtain more information through civil discovery in his forfeiture action. In his forfeiture deposition, Everingham also stated that Menghini had expressed concerns about the case and about Sweeney. In view of this testimony, Puertas had knowledge of Menghini's concerns. And had he wished to obtain additional information about those concerns, he could have interviewed Menghini about Quisenberry, and that is particularly so in view of Everingham's deposition statement that Menghini "stood up and stated that in his 20 some years of service, he's never sent an innocent man to prison and he wasn't about to start with this one." Everingham Dep. at 15–16 (June 16, 1999). The trial transcript also belies Puertas's claim that he did not know that Quisenberry failed to keep notes on each transaction. *See* Trial Tr. at 243 (Oct. 28, 1999) (during closing argument, Puertas's attorney stated that Quisenberry said, "I'm not going to take one note, okay? Not one note. . . . . I'm never going to take a note as to what happened, unless there's a deal"). And as to any discrepancy between Sweeney's and Quisenberry's statements regarding Sweeney's compensation, Puertas has not explained why he could not have covered this pertinent topic in a pre-trial deposition of Quisenberry or Sweeney, or during trial. Nor has he explained why this $100 to $150 discrepancy

in pay does not at most reflect a confluence of Sweeney's admittedly poor memory and Quisenberry's poor record-keeping.

Puertas next argues that he would have challenged the search warrants in the case had he known about Deputy Gary McClure's statement in the report that when he first started working for the Narcotics Enforcement Team, Miller told him "to add information to the search warrants to flower them up" and "reportedly told [him] that judges expect police officers to lie." JA 151. But, in truth, Puertas deposed McClure prior to his trial, and these allegations surfaced at that time. *See* McClure Dep. at 32–35 (July 1, 1998) (To strengthen the case for probable cause, "on more than one occasion [Miller] . . . would tell me specifically to put in [affidavits supporting search warrants] that there was short-term traffic . . . observed at a residence that . . . I was . . . investigating . . . [when] I never did any surveillance . . . . And he said, 'Put it in anyways. It's all right. They expect that, the judges expect that. That's not a problem.'"). The defense then relied on these allegations while cross-examining Miller during trial. *See* Trial Tr. at 103 (Oct. 14, 1999) ("Q: And there . . . have been accusations that you committed perjury by a former narcotics enforcement team officer, too. Is that correct?").

Puertas, finally, complains that he was prevented from "interview[ing] and call[ing] witnesses who corroborated that overtime reports had been falsified in order to corroborate false surveillance reports." Puertas Br. at 30. Here, again, the record shows that Puertas knew about these allegations before trial. *See* Everingham Dep. at 18–22 (June 16, 1999) (describing when Quisenberry would tell him to fill out overtime slips for times he had not worked to create the appearance that he had been present conducting surveillance on the Puertas investigation). And

during trial, Puertas's attorney raised the allegations when he cross-examined Quisenberry, *see* Trial Tr. at 212–15 (Oct. 22, 1999) (asking Quisenberry about Everingham's allegations), and mentioned them during his closing argument, *see* Trial Tr. at 245 (Oct. 28, 1999) ("Mr. Everingham accuses Mr. Quisenberry . . . on a couple of occasions . . . [of telling] them to fill out over time slips [to make it appear as though] he was there on the surveillance.").

Our colleague raises an additional point that deserves consideration. As she sees it, Puertas was nonetheless prejudiced because "the Report itself, apart from its contents, has independent significance." Dissent at 6. But Puertas has not made this argument. Perhaps because the report itself *rejects* the allegations of police misconduct, Puertas premises his *Brady* prejudice claim not on the report's existence but on the contents of the report, namely the statements and interviews in it that we have discussed above.

But even if Puertas had made this argument, the logic behind the position is not self-evident—that because the Michigan police "conducted an official investigation from which a Report resulted," "the allegations had some amount of credibility and gravity" even if the report ultimately rejected the allegations. *Id*. at 3. No evidence indicates what degree of "credibility and gravity" is needed to prompt the Michigan state police department to commence an "official investigation" (or whether the suggested distinction between "a general investigation" and "the official investigation," *id*. at 2, exists). And surely Puertas had sufficient information to develop *this* evidence, as his attorney knew about the investigation. Why Puertas chose to focus on the contents of the report rather than what it takes to start an official investigation is not in the record. But it hardly seems unusual that the defense would choose a strategy that focused not on the existence of an

- 12 -

investigation (which determined that there was no police misconduct) but on the contents of the interviews contained in the report. Indeed, without the report in hand, Puertas was free to present Everingham's allegations to the jury, but the jury never learned that the investigation into these allegations concluded that they were unfounded.

No less importantly, no Supreme Court authority supports this theory. *See* 28 U.S.C. § 2254(d)(1). The only case mentioned by the dissent, *Strickler*, involved documents that contained new, valuable information for the defense. *See* 527 U.S. at 266 ("The exculpatory material that petitioner claims should have been disclosed before trial includes documents prepared by [a prosecution witness], and notes of interviews with her, that impeach significant portions of her testimony."); *id*. at 273 (Because the "notes taken by [the detective] during his interviews with [the witness], and letters written by [the witness] to [the detective]" "cast serious doubt on [the witnesses's] confident assertion of her 'exceptionally good memory'" in her trial testimony, "the *content* of the documents is critical.") (emphasis added); *id*. at 273–75 & nn.8–10 (describing the content of the suppressed materials and identifying the information that the defense did not have at trial and that conflicted with the witness's trial testimony and otherwise cast doubt on her credibility). And *Strickler* did not involve a witness that the defense had already deposed. *See id*. at 285 n.27 (noting that the witness "refused to speak with defense counsel before trial"). Puertas, by contrast, did not stand to gain any additional help from the contents of the report. In the absence of Supreme Court authority supporting such a theory, this AEDPA claim necessarily fails.

B.

Puertas separately contends that the state court of appeals unreasonably applied Supreme Court precedent in denying his prosecutorial-misconduct claim. To prove prosecutorial misconduct, Puertas must show that the challenged remarks infected his trial with such unfairness that his resulting conviction was a denial of due process. *See Byrd*, 209 F.3d at 529. "To constitute a denial of due process, the misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation marks omitted).

Puertas first claims that the prosecutor improperly argued facts not in evidence when he suggested that Puertas had planted a bag of harmless white powder that officers discovered in one of Puertas's safes and that he did so as "a dig from that man who knew [the police] were coming." JA 624. The next day, Puertas moved for a mistrial based in part on this statement, arguing that it improperly implied that Puertas was a drug dealer and had been tipped off about the search. The trial court ruled the statement was not "grounds for a mistrial" and noted that "[t]he jury is instructed that if the attorneys argue something that isn't in evidence, they can't consider it." JA 643. Even "[a]ssuming that this reference to [Puertas's] motive for placing the powder in the safe was an unreasonable and improper inference drawn from the evidence," the court of appeals held that the "comment does not warrant relief because a special instruction would have cured any prejudice to defendants." *Puertas*, 2002 WL 31160304, at *14.

As an initial matter, the state court of appeals did not unreasonably apply Supreme Court precedent in holding that Puertas was not prejudiced by the comment for two reasons: first, because the court gave a general instruction at the close of evidence reminding jurors to consider only

properly admitted evidence, Trial Tr. at 22 (Oct. 29, 1999); and second, to the extent that Puertas felt

such a general instruction was insufficient, he could have, but did not, request a special curative instruction to mitigate the effects of the statement. Moreover, "prosecutors must be given leeway to argue reasonable inferences from the evidence," *Byrd*, 209 F.3d at 535 (internal quotation marks omitted), and the evidence supported the inferences that the prosecutor drew. Evidence in the record established: that Puertas sold cocaine to Sweeney; that drug-detecting dogs alerted to the safes owned by Puertas; that during the searches of nine safes and other property owned by Puertas, $1.9 million in cash and property was found; and that the day manager of the bowling alley testified that she never saw white powder in the safe and that she kept her white exercise supplement (the suspected source of the bag of harmless white powder) in a desk drawer, not in the safe.

Puertas next claims that the prosecutor violated his Fifth (and Fourteenth) Amendment right not to take the stand by commenting on his silence. *See Griffin v. California*, 380 U.S. 609, 615 n.5 (1965). After closing arguments, in the midst of an exchange between the attorneys concerning a defense objection, Puertas blurted out "He's done it from the start. They lied—." JA 627. The prosecutor apparently then asked Puertas's attorney "something along the lines of is Mr. Puertas going to testify[?]" JA 641. The court reporter did not transcribe this comment and Puertas's attorney says he did not hear it. But his attorney claimed that someone from the audience heard the comment and brought it to his attention later that day. Puertas then moved for a mistrial, claiming that the comment was audible on a tape of the proceedings and that the jury must have heard it.

The trial court denied the motion, expressing doubt that the jury ever heard the comment and noting that the jury instructions properly explained Puertas's constitutional right to remain silent. The state court of appeals agreed, reasoning that the admission by Puertas's counsel that he did not hear the statement supported the trial court's conclusion that the jury likely did not hear it either. "In any event," it noted, "we assume as we must that the jury instructions remedied the error to the extent one or more jurors heard the comment." *Puertas*, 2002 WL 31160304, at *14.

The state courts did not unreasonably apply Supreme Court precedent in reaching this conclusion. Both before and after this comment allegedly was made, the trial court instructed the jurors that they may not draw negative inferences from Puertas's failure to testify. Even if the jury did hear the comment, which seems unlikely in view of the trial court's ring-side observations of the incident, the instructions properly mitigated any risk that the statement would affect the jury's verdict. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Puertas next claims that the prosecutor improperly denigrated the defense when, in his closing, he said that the defense presented a case made up of "haze and smoke" and tried to distract the jury with "sound and fury," "bombastic antics" and "smoke and haze and innuendo and insinuation," accusing the defense of presenting evidence "designed to distract you from the truth in this case." Puertas Br. at 42–43. While prosecutors may not make "unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), the Michigan court of appeals noted that "[n]one of these prosecutorial comments drew any defense objections" and held that Puertas had forfeited this claim, *Puertas*, 2002 WL 31160304, at *14.

Having failed to object to the comments during trial, Puertas violated Michigan's rule that defendants must preserve their claims for appellate review by raising them in the trial court and thus has procedurally defaulted the claim. *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) ("[If] a habeas petitioner fails to obtain consideration of a claim by a state court . . . due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review."). Puertas never argues that this is not a consistently enforced procedural-default rule, but he does ask us to excuse his default and to view the failure to object as a strategic decision designed to avoid drawing attention to the prosecutor's remarks. But we may excuse a petitioner's procedural default only if he meets the exacting cause-and-prejudice standard or demonstrates that a fundamental miscarriage of justice will occur if we fail to consider the federal claim. *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991). Because defense counsel could have objected to these comments outside of the jury's presence (eliminating the strategic dilemma) and because a timely cautionary instruction presumably would have been effective, *see Marsh*, 481 U.S. at 211, Puertas has not established cause for his failure to object. And because Puertas has not submitted any new and reliable evidence of actual innocence, he has not shown a miscarriage of justice. *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003).

Puertas next argues that the prosecution made an improper civic-duty argument when it said the following during its closing argument:

> After this case is done and then you are able to go home and talk to your loved ones about what the case was about or your neighbors or whoever it is and you get there and you're in your backyard and you're leaning over the fence and you're talking to

> your neighbor and you say, yep, I just got done with this jury duty and we had this very interesting case. It was a drug case and a racketeering case and a conspiracy case and the Prosecutor had the actual person who bought the drugs from the two defendants and he had officers who actually witnesse[d] the transactions happen and they had $106,000—.

JA 626.

Generally speaking, a prosecutor has a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Viereck v. United States*, 318 U.S. 236, 248 (1943). But "[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001). Because the Michigan court of appeals did not discuss this claim when Puertas raised it there, we review the claim de novo. Like the district court, we agree that these less-than-pointed remarks appealed "more to the jury's common sense than to the jury's fear of community safety" and did not rise to the level of remarks designed to incite prejudice in a jury. *Puertas*, 342 F. Supp. 2d at 666. Any prejudice, moreover, was cured when the trial court sustained Puertas's objection to the comments and instructed the jury not to consider them in reaching its verdict. *See Marsh*, 481 U.S. at 211.

## C.

Puertas also objects to the trial court's failure to instruct the jury about missing evidence. Prior to trial, Puertas requested copies of affidavits prepared in support of search warrants involving controlled buys by Sweeney in an unrelated investigation before he began working on the Puertas

investigation. When the prosecution was unable to locate the affidavits, Puertas asked the trial court "for some kind of instruction to the jury" on the missing affidavits. JA 516. Although the trial court denied Puertas's request, it told Puertas he could "argue about it to the jury." JA 612.

A state-law challenge to an allegedly defective jury instruction faces a stiff burden. The claimant must show that the flawed instructions "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). In reviewing this claim, the Michigan court of appeals noted that in light of the generality of Puertas's request (for "some kind of instruction"), the trial court "acted within its discretion in declining to give an undefined jury charge regarding the prosecutor's inability to produce affidavits from unrelated cases that are sought only for impeachment purposes." *Puertas*, 2002 WL 31160304, at *12.

The court of appeals did not unreasonably apply *Naughten* in reaching this conclusion. Because the missing evidence was at most tenuously connected to the case and because Puertas had ample opportunities to cross-examine Sweeney and the police about Sweeney's credibility, the state appellate court could reasonably conclude that the trial court's refusal to give the requested instruction did not deprive Puertas of a fair trial.

D.

Puertas, lastly, claims that the trial court improperly admitted evidence about the dog sniffs, claiming that the evidence had little or no probative value and was highly prejudicial. He also objects that the court rejected his request for a cautionary instruction about this evidence.

During the searches of Puertas's property, two drug-detecting dogs alerted to nine safes that contained a substantial amount of U.S. currency but did not contain illegal drugs. At trial, two

forensic experts and two canine patrol officers testified about the training of the dogs and explained that the dogs' alerts indicated that narcotics recently must have been inside the safes. The trial court rejected Puertas's objection to this evidence and denied his request for a special limiting instruction to the effect that the drug-sniffing-dog evidence has little value as proof and that he could not be convicted on the basis of this evidence alone.

A trial court's error in applying state evidentiary law does "not rise to the level of [a] federal constitutional claim[] warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004). The Michigan court of appeals held that the trial court did not abuse its discretion in admitting the evidence and concluded that any risk of prejudice from the evidence did not substantially outweigh its probative value.

In attacking this ruling, Puertas argues that a considerable amount of United States currency contains residue from controlled substances and that many recent court decisions acknowledge this fact. At trial, however, the government's experts testified that a properly trained dog will not alert to the residue found on currency in general circulation. The experts explained that drug-detecting dogs are not trained to alert simply to cocaine but to the odor of methyl benzoate, which dissipates after two hours, making it unlikely that a dog would alert to the odor of the drug on currency unless that currency recently had been in the presence of cocaine.

The high degree of deference we accord state evidentiary decisions means that a claimant generally will not be able to question "rulings regarding the admission or exclusion of evidence . . . in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).

Because Puertas had the opportunity to question the reliability of this evidence at trial and because the challenged testimony addressed the reliability concerns that he raised, the state court of appeals' resolution of this claim does not entitle Puertas to habeas relief.

Much the same holds true for Puertas's argument that the trial court at a minimum should have granted his request for a cautionary instruction about the evidence. Again, we may not grant the writ simply because a jury instruction allegedly was incorrect under state law, *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991), and in this instance "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

While the state court of appeals concluded that the trial court should have given this instruction, it concluded that the omission did not warrant a new trial because it did not result in a miscarriage of justice. In view of the jury instructions that were given, the court reasoned, the jury had no basis for relying on the dog-sniff evidence alone to convict Puertas, and this evidence merely corroborated the "very powerful evidence" of six controlled buys of illegal narcotics. *See Puertas*, 2002 WL 31160304, at *11 ("An essential element to the charge of delivering cocaine is evidence of the intent to deliver. This evidence was established through the evidence of narcotic sales at the Megabowl, as demonstrated by the controlled buys executed by Sweeney. Likewise, the crime of operating a criminal enterprise is not established merely by evidence of possession of illegal narcotics and large amounts of cash. Rather, the prosecution was required to prove that [Puertas was] employed or associated with the Megabowl and knowingly participated in the affairs of the Megabowl through a 'pattern of racketeering activity' as that term is defined by Mich. Comp. Laws

No. 04-2405
*Puertas v. Overton*, *et al.*

§ 750.159f(c).  This pattern of racketeering activity was established by the evidence of multiple sales

of narcotics from behind the business counter of the Megabowl.") (footnote omitted).  The state

court

of appeals did not unreasonably apply Supreme Court precedent in reaching this conclusion.

III.

For these reasons, we affirm.

No. 04-2405
*Puertas v. Overton*, *et al.*

**KAREN NELSON MOORE, Circuit Judge, dissenting.** This case addresses the prosecution's outrageous failure to turn over to the defendant, Joseph Puertas, a report, completed weeks before trial, detailing an official investigation made by the State Police of allegations of local police misconduct in their investigation of Puertas. The prosecution's withholding of such vital information, which goes to the legitimacy of the state's case against Puertas, cannot be justified here. The majority denies Joseph Puertas habeas relief on his claim of state suppression of evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), because it concludes that the Michigan Court of Appeals did not unreasonably apply Supreme Court precedent in deciding that Puertas failed to show prejudice, the third element of a *Brady* claim.[1] Because I believe that the Michigan Court of Appeals unreasonably determined that Puertas has not satisfied the second and third elements of *Brady*, I respectfully dissent.

The majority agrees with the conclusion of the Michigan Court of Appeals that Puertas "failed to demonstrate that [he] exercised reasonable diligence to obtain the Michigan State Police public corruption investigative report," in particular because there was media coverage about the investigation of Oakland County Deputy Sheriff Kenneth Everingham's allegations of police misconduct.[2] *People v. Puertas*, No. 224173, 2002 WL 31160304, at *5 (Mich. Ct. App. Sept. 27,

---

[1]A successful *Brady* claim must satisfy the following three elements: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

[2]Although the majority classifies this aspect of the *Brady* analysis — whether a defendant could have independently accessed the information contained in the *Brady* material — as part of the third element's prejudice inquiry, it is better viewed as part of the inquiry under *Brady*'s

- 23 -

2002). Specifically, the majority concludes that Puertas either had knowledge of the contents of the Michigan State Police investigative report ("Report"), which memorialized the results of the investigation of Everingham's allegations, or that he had sufficient knowledge to have found the information contained therein with additional efforts. Majority Opinion ("Maj. Op.") at 5.

The conclusion on this point by both the majority and the Michigan Court of Appeals erroneously conflates several separate elements relating to Everingham's accusations of misconduct — the accusations themselves, a general investigation into the accusations, the official investigation done by the Michigan State Police, information that happened to be in the Report, and the fact that the Report existed and that particular information was contained in the Report — each of which has independent significance. Comments by Puertas's trial attorney reported in The Oakland Free Press indicate that Puertas knew about some of the allegations of police misconduct related to the investigation of Puertas. However, even if it could be shown that Puertas knew of the allegations and of some investigation into the allegations, it does not follow that he knew about the official investigation conducted by the Michigan State Police and that a Report containing the results was produced.[3]

_____

second element — whether the prosecution suppressed the evidence. The prosecution can only suppress evidence that is "wholly within [its] control," and thus if a defendant knew enough to have taken advantage of the evidence or could have accessed the evidence from another source, it is the second element of *Brady* that has not been met. *See Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

[3]The article quoting Puertas's trial attorney was published on June 18, 1999. *See* Stephen W. Huber, *Ex-Deputy Says He Lied About Seeing Drug Sale*, The Oakland Press, June 18, 1999, at A-1, A-12. That article indicates that Puertas knew about some of Everingham's allegations. Although this article and another later-published article mention an investigation into the allegations, and thus Puertas could be charged with knowledge of an investigation, *see id.*; L.L.

Independent knowledge of some of the information that happened to be contained in the Report is not the equivalent, for *Brady* purposes, of knowledge that a Report was issued and that certain claims could be substantiated by the Report. The fact that the Michigan State Police conducted an official investigation from which a Report resulted indicates that the allegations had some amount of credibility and gravity. Although Puertas knew about some of the information included in the Report, that an official investigation was conducted and a Report was issued lends credence to the possibility that Puertas was set up and that the charges against him were entirely fabricated. Puertas's knowledge of some of the contents of the Report, including problems with the credibility of the informant Joseph Sweeney, discrepancies in testimony, and irregularities related to his own investigation that are documented in the Report, and his reliance on this information at trial, is not dispositive of whether Puertas was prejudiced by not having access to the Report. Substantiating these suggestions regarding shortcomings in the investigation of Puertas with the official Report by the Michigan State Police would have lent them much greater weight with the jury, and thus the prosecution's failure to disclose the Report was prejudicial. *See Strickler v. Greene*, 527 U.S. 263, 284-85 & n.26 (1999) (distinguishing between the fact that interviews had occurred and the contents of those interviews, on the one hand, and that documents relating to these interviews had been produced, on the other).

The majority agrees with the conclusion of the Michigan Court of Appeals that Puertas had

---

Brasier, *Oakland Drug Case Tests Police Claims on $5 Million*, Detroit Free Press, Oct. 8, 1999, at 1B, it is not clear from the record when the Michigan State Police began its official investigation. Moreover, as discussed at greater length in the main text, knowledge of the investigation is not equivalent to knowledge of the resulting Report for *Brady* purposes.

sufficient knowledge to have accessed the Report through "reasonable diligence" because local media articles reported on Everingham's allegations and the resulting police investigation. Maj. Op. at 5-6; *Puertas*, 2002 WL 31160304, at *5. However, in the context of an analysis of whether cause had been shown to overcome procedural default, the Supreme Court rejected this same inferential leap. *See Strickler*, 527 U.S. at 284-85. The Court held that "a letter published in a local newspaper" containing statements from a witness that made it clear that she had been interviewed several times by a particular detective was insufficient to alert the defendant to the existence and suppression of records relating to those interviews. *Id.*

In this case, although the investigation and Report were completed on September 23, 1999, the Report itself came to light only after Puertas's conviction, when, pursuant to requests made under the Freedom of Information Act, 5 U.S.C. § 552, a newspaper obtained copies of the Report and made them available to the defense. This belies the contention of the Michigan Court of Appeals that the Report would have been available to Puertas were it pursued with "reasonable diligence." *Puertas*, 2002 WL 31160304, at *5. Moreover, Puertas *did* in fact make a motion for additional discovery, which was granted on June 10, 1998. Puertas should not have been expected to "scavenge for hints of undisclosed *Brady* material," *Banks v. Dretke*, 540 U.S. 668, 694-95 (2004), because he reasonably relied on the discovery order, which directed the prosecution to turn over to Puertas "[a]ny and all statements of interviews conducted by the prosecution and/or any investigating police agency from the beginning of the investigation until trial . . . whether in the possession of the Oakland County Prosecutor's Office or *any of the police investigating agencies*." Joint Appendix at 113 (Order Granting Motion for Additional Discovery) (emphasis added).

The Supreme Court has repeatedly held that a defendant can reasonably rely on the prosecution's representation that it has disclosed all *Brady* evidence, and that once the prosecution confirms this representation, the defendant is under no further duty to investigate additional *Brady* materials. *See Banks*, 540 U.S. at 692-94 (acknowledging reasonable reliance on the state's assertion that it would disclose all *Brady* material); *Strickler*, 527 U.S. at 289 (recognizing reasonable reliance on the prosecution's open-file policy). Like the defendants' reasonable reliance on the assertion in *Banks* and the open-file policy in *Strickler*, Puertas reasonably relied on the state trial court's order that the prosecution turn over to him materials like the Report in question. That the prosecution was under this continuing obligation by order of the court to disclose such materials confirmed Puertas's reasonable reliance, thereby relieving him of the responsibility of inquiring about additional *Brady* materials. *Cf. Banks*, 540 U.S. at 694 ("[I]t was . . . appropriate for [the defendant] to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction."); *Strickler*, 527 U.S. at 286 (noting "[t]he presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties" (quotations omitted)). Puertas had no reason to suspect that a Report had been issued, and, even if he did, he would have reasonably relied on the prosecution to comply with the court order to turn over such materials. *See Banks*, 540 U.S. at 693-94; *Strickler*, 527 U.S. at 285-88.

Given that knowledge of the Report does not flow from knowledge of the allegations and the investigation, that Puertas did not neglect to act with "reasonable diligence" in failing to discover the Report, and that the fact of the Report itself, apart from its contents, has independent significance in terms of prejudice, the majority's explanations regarding what Puertas either knew or should have

known about the contents of the Report are insufficient to refute the materiality of the Report. We review the conclusion of the Michigan Court of Appeals that the Report was not material, a mixed question of law and fact, to assess whether it was an "unreasonable application" of the Supreme Court's governing standard on materiality — whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). *See* 28 U.S.C. § 2254(d)(1); *Joshua v. DeWitt*, 341 F.3d 430, 436 (6th Cir. 2003); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). The reasonable-probability standard is met "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

As discussed earlier, although Puertas may have raised a variety of impeaching and exculpatory information at trial that was contained in the report, including the lack of credibility of the informant, Joseph Sweeney, and other problems with the investigation, Puertas did not, because he could not, rely on the fact that this information was credited by an official investigation by the Michigan State Police, which would have greatly enhanced the value of this information.[4] Only if Puertas had knowledge of and access to the Report could he have presented the pertinent parts of

---

[4]The majority's explanation of one discrepancy is particularly unsatisfying. Sweeney, the informant, testified at trial that on several occasions he was paid $50 to $160 less than what Sergeant Kenneth Quisenberry of the Oakland County Sheriff's Department told the Michigan State Police that Sweeney was paid for each drug transaction. The majority states that this "at most reflect[s] a confluence of Sweeney's admittedly poor memory and Quisenberry's poor record-keeping." Maj. Op. at 11. However, Puertas should have had this information available to him both for impeachment purposes and to suggest that Quisenberry's motives were tainted by financial interest.

the Report so that the impeaching evidence could be accorded the proper weight by the jury. In particular, the Report confirms inconsistencies regarding how Puertas was identified as a suspect, which constitutes powerful exculpatory evidence because it supports the theory that Puertas was set up and that the charges against him were completely manufactured. It is unreasonable for the Michigan Court of Appeals to fail to acknowledge that the Report by the Michigan State Police (confirming the incredibility of the informant, the sloppy work of the local police, and the discrepancies in the local officers' statements) would have far greater influence than the defense attorney's mere suggestion of the same evidence.

The Michigan Court of Appeals relies heavily on the evidence in the Report that it considers unfavorable to Puertas (namely, that Everingham was an irresponsible employee with a gambling problem and that the Report ultimately found his allegations to be unfounded) to determine that Puertas was not prejudiced by the unavailability of the Report. The Michigan Court of Appeals was unreasonable in reaching this conclusion. First, the state court should have recognized that the Oakland County Sheriff's Department ("the Sheriff's Department") had motives to downplay the problems with its investigation of Puertas. In addition to a desire to preserve its integrity, the Sheriff's Department faced civil liability due to a lawsuit brought by Everingham and also stood to reap financial benefits from the Puertas case due to the forfeiture of the assets involved. *See* L.L. Brasier, *Oakland Drug Case Tests Police Claims on $5 Million*, Detroit Free Press, Oct. 8, 1999, at 1B. Second, the fact that the Report ultimately concluded that Everingham's allegations were unfounded is not highly relevant to the *Brady* prejudice analysis because the evidentiary standard used by the Michigan State Police to confirm such allegations is markedly different from the

evidentiary standard required to convict Puertas. Although there may not have been sufficient evidence for the State Police to conclude that misconduct occurred, the Report could, and in fact, does, raise enough suspicions regarding the investigation of Puertas to create a reasonable doubt as to his guilt. For these reasons, the suppressed evidence "put[s] the whole case in such a different light as to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435. The Michigan Court of Appeals acted unreasonably in applying the prejudice component of *Brady*.

The majority affirmed the district court's denial of Puertas's *Brady* claim on the third element and therefore found no need to discuss the other two elements.[5] Because I believe, as explained above, that Puertas has satisfied *Brady*'s third element, I will address the first two elements. As the majority notes, there is no dispute that Puertas has satisfied the first element of his *Brady* claim because the Report has both exculpatory and impeachment value.[6] *See Strickler*, 527 U.S. at 281-82.

The Michigan Court of Appeals concluded that Puertas failed to satisfy the second element, which requires that the evidence has been suppressed by the state, *Strickler*, 527 U.S. at 282, because "possession" of the product of the Michigan State Police investigation could not be imputed

---

[5]As explained in note two above, the majority's rejection of the claim on the ground that Puertas knew the substance of Report or knew enough to discover it through further inquiry is best understood as falling within the second element — whether the prosecution suppressed the evidence.

[6]Puertas contends that the Michigan Court of Appeals erroneously decided that impeaching evidence is not favorable evidence under *Brady*. The district court correctly concluded that the Michigan Court Appeals recognized both the proper significance of impeaching evidence under *Brady*'s first element and that Puertas had satisfied this element of *Brady* based on the Report's impeachment value. *Puertas v. Overton*, 342 F. Supp. 2d 649, 658 (E.D. Mich. 2004).

to the prosecution or the Sheriff's Department, *Puertas*, 2002 WL 31160304, at *5. The district court erred in concluding that this decision was reasonable. *Puertas v. Overton*, 342 F. Supp. 2d 649, 659 (E.D. Mich. 2004).

The Supreme Court has held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. Supreme Court precedent does not require possession to trigger the prosecutor's duty to disclose, and in fact, holds quite the opposite. In *Kyles*, the Court expressly rejected the state's argument that it had no duty to disclose materials known only to the police and not to the prosecution. 514 U.S. at 438. In dismissing this suggestion, the Court stated that "[s]ince, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Id.* The Court explained that "'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'" *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). It is clear, then, that the Supreme Court does not require actual knowledge, much less possession, of evidence, to satisfy the second element of *Brady*. Because the Sheriff's Office repeatedly interviewed individuals from the Oakland County Prosecutor's Office ("the Prosecutor's Office") in the course of its investigation of Everingham's charges, it is equally clear that the prosecution was aware of "favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437.

The decision of the Michigan Court of Appeals that "the investigation by the State Police was not taking place on behalf of the Oakland County Prosecutor[,]" and "may fairly be characterized as being adverse to the Oakland County Sheriff's Department," *Puertas*, 2002 WL 31160304, at \*5, is unreasonable because it fundamentally misunderstands the role of the prosecutor as set forth by the Supreme Court. The prosecutor is "'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done,'" *Kyles*, 514 U.S. at 439 (alterations in the original) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). The Prosecutor's Office, of course, has no interest in pursuing a conviction based on fabricated charges or false evidence. Therefore, the Michigan State Police investigation, conducted with the full cooperation and involvement of the Prosecutor's Office, was conducted "on the government's behalf in the case" because it was aimed at preserving the integrity of Puertas's criminal prosecution. *See Kyles*, 514 U.S. at 437-40. The prosecution's withholding of this critical document from Puertas reveals an indefensibly narrow view of its duty to disclose.

For the foregoing reasons, the denial by the Michigan Court of Appeals of Puertas's *Brady* claim constituted an "unreasonable application of[] clearly established Federal law." 28 U.S.C. § 2254(d)(1). Therefore, I would grant Puertas's habeas petition on this basis. I respectfully dissent.